# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs November 1, 2016

## STATE OF TENNESSEE v. YUSUF RAHMAN

**Appeal from the Criminal Court for Shelby County**
**No. 15-01981          John Wheeler Campbell, Judge**
_____

**No. W2016-00906-CCA-R3-CD  -  Filed March 9, 2017**
_____


A jury convicted the Defendant, Yusuf Rahman, of one count of attempted second degree murder, two counts of aggravated assault, and one count of domestic assault. The trial court sentenced the Defendant to thirty years for attempted second degree murder, fifteen years for each aggravated assault conviction, and eleven months and twenty-nine days for domestic assault. The trial court ran the sentences concurrently and merged the aggravated assault convictions. The Defendant asserts that the evidence is insufficient to support the attempted second degree murder conviction and that the trial court should have instructed the jury on self-defense. After a thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and J. ROSS DYER, JJ., joined.

Stephen C. Bush, District Public Defender; Tony N. Brayton, Assistant District Public Defender (on appeal); and John Zastrow and Patrick Newport, Assistant District Public Defenders (at trial), for the appellant, Yusuf Rahman.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Josh Corman and Meghan Fowler, Assistant District Attorneys General, for the appellee, State of Tennessee.


**OPINION**

## FACTUAL AND PROCEDURAL HISTORY

A Shelby County Grand Jury indicted the Defendant for one count of attempted first degree murder, two counts of aggravated assault, one count of aggravated burglary, and one count of domestic assault. The Defendant was accused of the attempted murder of a man and the domestic assault of a woman, following a dispute involving alcohol between the Defendant and the victim of the attempted murder.

Mr. Marvin Jackson, the victim to the attempted second degree murder and aggravated assaults, testified that he had known Ms. Felisa Grant, the Defendant's girlfriend and the domestic assault victim, for approximately eleven or twelve years. He described their relationship as a friendship. He explained that he has gout, which makes it difficult for him to walk, and that Ms. Grant assisted him by cleaning his apartment and doing his laundry for him.

On November 22, 2014, Ms. Grant and the Defendant went to Mr. Jackson's apartment to visit. After their arrival, the Defendant went to the liquor store to purchase liquor for Mr. Jackson. When the Defendant returned from the liquor store, he grabbed a knife in the kitchen and stabbed Mr. Jackson's table. Mr. Jackson testified that he asked the Defendant why he stabbed the table, and the Defendant did not respond. Mr. Jackson said the Defendant went to where Ms. Grant was sitting in the apartment and "slapped her up side the head a couple of times." Mr. Jackson testified that after the Defendant struck Ms. Grant, he told the Defendant to leave, the Defendant refused to do so, and then Mr. Jackson left the apartment because he felt that "something was fixing to happen" and that his "life was in danger." When Mr. Jackson left the apartment, the Defendant followed Mr. Jackson with the knife he used to stab the table. The Defendant then approached Mr. Jackson from behind, and Mr. Jackson turned around to face the Defendant. Mr. Jackson stated, "He come around with the knife. … I caught the knife. I broke the knife." He described the knife as being about eight inches before it broke and about four to five inches after it broke. After Mr. Jackson broke the knife, the Defendant began stabbing Mr. Jackson with the knife, five times in total to the stomach and back. Mr. Jackson testified that the stabbing left him weak, bleeding, and feeling like he was dying. After the offenses, Mr. Jackson identified the Defendant as the assailant in a photographic lineup conducted by the police.

On cross-examination, Mr. Jackson testified that he did not have any problem with the Defendant before the attack and that the Defendant "had no reason to assault [him]." Mr. Jackson admitted that on the day of the attack, he drank a pint of liquor, but he maintained that he was not intoxicated. Mr. Jackson acknowledged that he had told a treating nurse that he had only consumed beer that day. He denied being too intoxicated to remember the details of the attack and instigating the fight with the Defendant.

-2-

On re-direct examination, Mr. Jackson testified that during the attack, the door knob to his apartment door was damaged. He stated the door knob looked like the Defendant "took both feet and kicked the door knob and broke the door knob." He testified that he saw the Defendant kick his door.

Officer William Smith of the Memphis Police Department was one of the responding officers to the 911 call concerning Mr. Jackson. He described the scene upon arrival as "pretty gruesome." He noted that Mr. Jackson was lying on the ground "with multiple stab wounds and surrounded by blood." He testified that the suspect was not on the scene when he arrived but that he was able to determine the identity of the perpetrator. Officer Smith said Ms. Grant was able to recall what had occurred and who was responsible. He collected information from Ms. Grant and reported details about the suspect to the police department for broadcast. He stated that he did not believe Ms. Grant was intoxicated while they spoke with each other, although he did detect alcohol on her breath. Officer Smith testified that he found a broken knife handle on the scene several feet away from Mr. Jackson. He also testified that Mr. Jackson's door was "split" and "broken up" and that the lock to Mr. Jackson's door "had been knocked off" and was on the ground. On cross-examination, Officer Smith stated that Ms. Grant was somewhat "hysterical" and was crying.

Mr. Allen Courtney, with the Memphis Fire Department, was a responding paramedic to the crime scene. The trial court accepted Mr. Courtney as an expert in defensive wound identification. He testified that after he made his assessment of Mr. Jackson, he determined that Mr. Jackson needed to be taken into surgery. He observed that Mr. Jackson

> had multiple stab wounds to his shoulder blade area, upper back. They ranged 1 inch to 2 inches … in length. He also had three in his abdomen. He also had what … I've been taught to look for and stuff especially in stab wounds is defensive wounds to his hands when you get stabbed or when you're being attacked or however you want to look at it. You're always going to try to defend yourself. So you're going to grab whatever someone has. He had cuts to his fingers.

Mr. Courtney testified that upon their arrival to the hospital, the hospital staff immediately brought Mr. Jackson in for surgery.

On cross-examination, Mr. Courtney testified that there was blood around Mr. Jackson and "further down the hallway." He did not know whether the blood belonged to

Mr. Jackson. He stated that he did not see the suspect at the scene and did not know what injuries the suspect might have received during the stabbing.

Officer J.R. Rector of the Memphis Police Department, a crime scene investigator, testified that the knife handle was found just outside Mr. Jackson's apartment door. Officer Rector testified that he did not know whose blood was found throughout the hallway. He did not remember seeing a surveillance camera at the crime scene. He did not take fingerprints from the knife handle and did not measure a footprint that was found on the scene. He testified that the door to Mr. Jackson's apartment appeared to be "forced in from the outside of the apartment." Officer Rector stated that the door had damage to the wood around the door latch.

Sergeant Steven Kent of the Memphis Police Department, an investigator for the Felony Response Bureau, testified that when he arrived at the crime scene, Mr. Jackson's apartment door looked "broken in." On cross-examination, Sergeant Kent stated that he believed the crime scene could have been a homicide scene. He testified that he did not conduct a fingerprint analysis on the knife handle at the crime scene. He stated that he did not see any surveillance cameras in the immediate area of the crime scene. He also stated that the Felony Response Bureau did not conduct a genetic test of the blood at the crime scene.

Sergeant Lorenzo Young of the Memphis Police Department, an investigator for the Felony Response Bureau, testified that when he arrived at Mr. Jackson's apartment, he spoke with Ms. Grant. He stated that Ms. Grant was the only witness of whom he was aware on the scene, that she gave a formal statement, and that charges were filed against the Defendant based on Ms. Grant's formal statement.

After the close of the State's proof, the State dismissed the aggravated burglary charge against the Defendant.

The Defendant called Ms. Grant as his first witness. She testified that the Defendant, at the time of the trial, was her boyfriend. She stated that she and Mr. Jackson used to have a friendship and characterized Mr. Jackson as an alcoholic. Ms. Grant testified that Mr. Jackson, the Defendant, and she were all roommates. She also testified that on the day of the offenses, Mr. Jackson had been drinking when he asked the Defendant to get him more alcohol. She stated that "he had already been on a three-day binge, so this was going on the fourth day, third day, whatever, however many days." Ms. Grant stated that Mr. Jackson was drunk on the day of the offenses. She testified that when the Defendant returned from getting Mr. Jackson more alcohol, the Defendant "did not kick the door in." She then heard the Defendant and Mr. Jackson "having a discussion about where is his [liquor]." She stated that "[t]he [liquor] had rolled up under

-4-

the chair and at the time he didn't know that." She testified that an argument between Mr. Jackson and the Defendant started regarding the location of the liquor. She stated that the Defendant tried to explain that he gave Mr. Jackson his liquor and that Mr. Jackson argued that he never received the bottle. She also testified that the Defendant left the apartment because he "didn't want to argue." During the argument between Mr. Jackson and the Defendant, Ms. Grant was in a bedroom, and she "came out for a brief moment to try to salvage the argument." She stated that at that point, she was hit and did not know who hit her. Ms. Grant admitted that she had been drinking during the time of the offenses but contended that she was not drunk, merely "tipsy." She stated that while she was in the bedroom, she saw the Defendant walk out the door of the apartment and did not see him leave with a knife. She testified that she never heard the Defendant stab a table in the apartment and that she never saw "knife marks all over [the] table." Ms. Grant also testified that when the Defendant left the apartment, the front door was still completely intact.

She stated that after the Defendant left the apartment, she heard someone, who she believed to be Mr. Jackson, go into the kitchen and start making a lot of noise in the silverware drawer. She testified that Mr. Jackson then left the apartment and "slam[med] the door really hard." She stated that she heard Mr. Jackson and the Defendant arguing in the hallway outside the apartment and then "all of the sudden it got real quiet." She went outside to determine what happened and found Mr. Jackson lying on the ground and bleeding. She testified that she assumed the Defendant stabbed Mr. Jackson. Ms. Grant stated that she did not see the fight take place. She testified that there is "a camera on every floor" and that "a camera should [have] caught this fight." After she came across Mr. Jackson lying on the floor, she called for an ambulance.

When the police arrived, Ms. Grant spoke with police investigators. She stated that she was "in a frantic state" when she gave her statement to the police. She testified that she did not read the statement when she signed the statement typed up by police. She stated that she was distraught and confused and that she did not read her statement before signing it because she "just wanted to go." She also stated that she believed she "would get in trouble if" she did not sign the statement. She testified that she and the Defendant had a "long history," that the Defendant had mistreated her in the past, and that she had previously called the police because of him. She stated, however, that she was not afraid of the Defendant and did not believe she was a victim.

On cross-examination, Ms. Grant testified that although her relationship with the Defendant was not always abusive, the Defendant was responsible for "multiple incidents" of domestic violence against her. The prosecutor played the recorded 911 call that Ms. Grant made after the offenses. She testified that although she said during the call that the Defendant was "stabbing" Mr. Jackson, she meant to say that the Defendant

-5-

"stabbed" Mr. Jackson and explained that she did not see Mr. Jackson get stabbed. She stated that she saw the Defendant about two to three days after the offenses. She testified that she did not recall where the Defendant was during the time between the offenses and when she saw him.

She admitted that while the police were conducting their investigation at the crime scene, she told Officer Smith that the Defendant hit her in the face. She also admitted that she told Officer Smith that the Defendant was "the person responsible for the stabbing." She could not recall telling Officer Smith that after the argument, the Defendant forced his way through the door of the apartment, grabbed a knife from the kitchen, and then stabbed Mr. Jackson. She did not recall whether she told Officer Smith that Mr. Jackson followed the Defendant out of the apartment. She conceded that she did not tell the police that the Defendant tried to leave the apartment to avoid confrontation with Mr. Jackson.

She also conceded that she probably said to Sergeant Young, "I can't believe [the Defendant] stabbed my friend." She acknowledged that she told Sergeant Young, in her formal statement, that she saw the Defendant stab Mr. Jackson with a butcher knife. She explained the discrepancy in her statement and her testimony at trial by stating that she had been drinking and "was still distraught." She testified that Sergeant Young asked her to give statements relating to what she thought happened, rather than what she witnessed. She did not recall saying in her formal statement,

> I got to [Mr. Jackson's] house and he was telling me that [the Defendant] was on his way there. So I was cooking and when [the Defendant] got there he was asking me where the [liquor] was at. So this started an argument and [the Defendant] … hit me in my mouth. [Mr. Jackson] asked him to stop talking to me like that so [the Defendant] got mad at [Mr. Jackson]. He told him he would kill both of us. So [the Defendant] went to the kitchen and got a knife and came back. He just started stabbing [Mr. Jackson] over and over. I ran out of the apartment to get help.

After hearing that part of the statement read by the prosecutor, she asserted that the stabbing occurred in the hallway not in the apartment. She also did not recall saying in her formal statement that the Defendant attacked Mr. Jackson because "[the Defendant] stopped, stopped drinking but he took a drink today." She confirmed that Sergeant Young asked her if her statement was given freely and voluntarily, if she could read and write without the aid of glasses, to read the statement in its entirety, and to sign the statement if it was accurate. She also confirmed that she did in fact sign the statement. She denied, however, ever reading the statement. In attempting to explain the differences

between her testimony and her formal statement to police, she argued that she gave her formal statement based on her instinct about what occurred without hearing from the Defendant about his side of the story.

On re-direct examination, Ms. Grant testified that the only time that she gave the version of events in the formal statement was the evening of the offenses. She also testified that she had been drinking and was "frazzled" when she gave her statement. She stated that at trial, she could "comprehend better," "understand what the questions [were]," and "answer without being confused." She testified that she sometimes has poor word choice and needs time to explain herself "to get [her] meaning across" to others. She stated that she believed she used the wrong words on the day of the offenses to describe her account of the events that transpired.

On re-cross examination, Ms. Grant testified that she did not "witness a stabbing." She also testified that she attempted to correct her story with the police after she read her formal statement for the first time. On further re-direct examination, Ms. Grant testified that she would not commit perjury for the Defendant's benefit. The Defendant then rested his case.

The State began its rebuttal proof with Sergeant Glenn Barber of the Memphis Police Department. He testified that he was never able to obtain surveillance footage of any kind from the crime scene and that the surveillance system at the apartment was not functioning properly at the time of the offenses. He stated that to his knowledge, no such footage ever existed.

The State recalled Officer William Smith, who testified that Ms. Grant "did [not] seem to be too frantic or intoxicated" to give her account of the offenses to him. He testified that Ms. Grant told him that the Defendant struck her in the mouth. He stated that Ms. Grant told him that the Defendant was her ex-boyfriend and that she was Mr. Jackson's caretaker. Officer Smith read from Ms. Grant's account of the facts to him in her statement as follows:

> [T]hey were all drinking inside the apartment. And they sent the [Defendant] out to go and get some more alcohol. And once he, you know, returned he came back, you know, to the apartment, came on the inside and [the Defendant] and Ms. Grant had a[n] argument ….
>
> ….
>
> She kicked him out. And that's when he kicked the door in. And he hit her on the mouth. And he stated that, you know, he was going to kill them.

And went to the kitchen and got a knife and that's when he stabbed Mr. Jackson.

On cross-examination, Officer Smith testified that when he spoke to Ms. Grant for the first time, the scene was hectic, Ms. Grant was crying and sitting next to Mr. Jackson who was bleeding, and he could smell alcohol on Ms. Grant's breath. He stated that although he did not take notes while speaking with Mr. Jackson and Ms. Grant, he took notes on his conversation with them within twenty to thirty minutes of arriving on scene. He testified that although his conversation with Mr. Jackson and Ms. Grant was not very detailed, he was able to determine what happened and who the suspect was. Officer Smith testified that Ms. Grant told him that Mr. Jackson was "stabbed inside the apartment." He recalled that there may have been blood at the threshold of the apartment's front door.

The State recalled Sergeant Young, who testified that when he first spoke with Ms. Grant, she said to him, "I can't believe that [the Defendant] did this." He also testified that when he took Ms. Grant's formal statement, Ms. Grant "was able to explain to [him] what had happened."

On cross-examination, Sergeant Young testified that he did not know how much Ms. Grant had to drink the night of her formal statement. He also testified that she had been crying and she seemed distraught. During Sergeant Young's testimony, Ms. Grant's formal statement was admitted without objection.

At trial, the Defendant argued that he was entitled to instruct the jury on the issue of self-defense. The trial court rejected the Defendant's argument, finding that the issue was not reasonably raised by the proof and that the Defendant was calling for too much speculation to support the defense.

At the close of the State's and the Defendant's proof, the jury returned a verdict finding the Defendant guilty of the attempted second degree murder of Mr. Jackson, one count of aggravated assault causing serious bodily injury against Mr. Jackson, one count of aggravated assault using or displaying a deadly weapon against Mr. Jackson, and domestic assault against Ms. Grant. At the sentencing hearing, the trial court imposed an effective sentence of thirty years at forty-five percent. The trial court found that the Defendant was a Range III persistent offender. The Defendant received a thirty-year sentence for attempted second degree murder, a fifteen-year sentence for the merged aggravated assault convictions, and an eleven-month and twenty-nine-day sentence for the domestic assault conviction.

## ANALYSIS

-8-

# I. Sufficiency of the Evidence

On appeal, the Defendant argues that the evidence presented at trial was insufficient to support an attempted second degree murder conviction. When an accused challenges the sufficiency of the evidence, this court must review the record to determine if the evidence adduced during the trial was sufficient "to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). The appellate court determines "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis provided). In determining the sufficiency of the evidence, this court does not reweigh or reevaluate the evidence. *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004). Instead, this court affords the State the strongest legitimate view of the evidence contained in the record, as well as all reasonable and legitimate inferences that may be drawn from that evidence. *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). The conviction replaces the presumption of innocence with a presumption of guilt, and the accused has the burden of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Tennessee Code Annotated section 39-13-210(a)(1) defines second degree murder as the "knowing killing of another." "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b). Tennessee Code Annotated section 39-12-101 defines attempt, as charged in the indictment, as:

> (a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
>
> …
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> ….

(b) Conduct does not constitute a substantial step under subdivision (a)(3) unless the person's entire course of action is corroborative of the intent to commit the offense.

Although the Defendant argues that there were no eyewitnesses to the stabbing, both Mr. Jackson and Ms. Grant, in her formal written statement that was admitted as substantive evidence, gave accounts of witnessing the Defendant stab Mr. Jackson. The Defendant also argues that there is a lack of evidence to support Mr. Jackson's claim that the Defendant stabbed the table in the apartment or Ms. Grant's claim that she ran out of the apartment after the Defendant stabbed Mr. Jackson in the apartment because "[t]here was no evidence of damage to any table and no blood was found in the apartment." We note that neither of these aspects of Mr. Jackson's testimony or Ms. Grant's statement constitute necessary proof for the elements of the crime that the Defendant now challenges. The Defendant seems to call into doubt Mr. Jackson's testimony regarding the breaking of the knife by noting that Mr. Jackson "was then stabbed multiple times by a knife with [a] twice broken blade." We note that the Defendant again mischaracterizes the proof presented at trial because Mr. Jackson testified that the knife was still about four to five inches in length after he broke it and that responding officers found a broken knife at the crime scene. The Defendant contends that evidence should have been provided regarding "whether any of the stab wounds individually or collectively were life threatening" and whether the Defendant "knew his actions were likely to cause death." The evidence, however, shows that the scene of the stabbing was "gruesome," Mr. Jackson was lying in a pool of blood when the paramedics arrived, he was rushed to the hospital for immediate care for his wounds, the Defendant stabbed Mr. Jackson multiple times in the torso, and the Defendant fled the scene while Mr. Jackson bled on the ground by himself.

We conclude that the evidence is sufficient to sustain the Defendant's conviction for attempted second degree murder. Mr. Jackson testified that the Defendant attacked him with a knife and stabbed him five times in the torso following an argument. Mr. Jackson testified that he felt weak and thought he was going to die after the attack. Ms. Grant, in her formal statement to police, stated that she witnessed the Defendant stab Mr. Jackson "over and over." The responding paramedic, Mr. Courtney, testified that Mr. Jackson had to be transported to the hospital for immediate surgery. Further, the jury was free to weigh the credibility of the State's and the Defendant's proof, including the Defendant's only witness, Ms. Grant, and her glaringly different accounts of the stabbing given in her formal statement compared to her trial testimony. After viewing the evidence in the light most favorable to the State, the evidence is sufficient to support the jury's finding that the Defendant committed attempted second degree murder.

-10-

## II. Jury Instructions

The Defendant argues that the trial court erroneously refused to instruct the jury on self-defense. The State counters that the Defendant did not present sufficient proof at trial to sustain a jury finding of self-defense and that his argument requires too much speculation to require a self-defense instruction.

Determining whether a defendant is entitled to a jury instruction on a defense is a mixed question of law and fact reviewed de novo. *State v. Hawkins*, 406 S.W.3d 121, 128 (Tenn. 2013). Generally, the trial court has a duty "to give a complete charge of the law applicable to the facts of the case and the defendant has a right to have every issue of fact raised by the evidence and material to his defense submitted to the jury upon proper instructions by the judge." *State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975). In evaluating whether a defense instruction is raised by the evidence, the trial court must look at the evidence in the light most favorable to the defendant to determine whether there is evidence pertaining to the defense that reasonable minds could accept. *State v. Sims*, 45 S.W.3d 1, 9 (Tenn. 2001). "An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005). "The issue of the existence of a defense is not submitted to the jury unless it is fairly raised by the proof." T.C.A. § 39-11-203.

Self-defense is statutorily defined in Tennessee Code Annotated section 39-11-611, which provides:

> (2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:
>
> (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
>
> (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
>
> (C) The belief of danger is founded upon reasonable grounds.

T.C.A. § 39-11-611(b).

In *State v. Ivy*, the defendant similarly argued that he was erroneously denied a self-defense jury instruction. The defendant's proof consisted of three witnesses that testified that they saw the victim "swing a jack iron" and that the defendant did not cause injury to the victim until after the victim attempted to strike the defendant with the jack iron. *State v. Ivy*, 868 S.W.2d 724, 726 (Tenn. Crim. App. 1993). The court noted that "[t]he jury is to resolve the factual dispute and ascertain the applicable law." *Id.* at 728. The court held that because the defendant's proof tended to support the elements of self-defense, the trial court erred by failing to give the self-defense instruction.

Viewing the proof in the light most favorable to the Defendant, there was no evidence that reasonable minds could have accepted regarding the defense. The Defendant provided no evidence that he had a reasonable belief that he faced an imminent danger of serious bodily injury or death, that Mr. Jackson's alleged attack against the Defendant created in the Defendant a belief of imminent death or serious bodily injury and was real or honestly believed to be real at the time of the attack, or that the Defendant's belief was based on reasonable grounds. The only evidence that the Defendant offered to support his self-defense theory was the trial testimony of Ms. Grant. Her testimony did not relate to the stabbing itself because she did not witness the act take place and she did not see Mr. Jackson with a knife. Although Ms. Grant's formal statement gave a completely contradictory account of the events, Ms. Grant testified that she heard who she believed to be the victim rummaging through a knife drawer and leaving after the Defendant. She offered no more conceivable testimony to support a theory of self-defense. Although the Defendant did not receive a self-defense instruction, the jury was still at liberty to accredit the account of events that Ms. Grant provided at trial, which they ultimately did not do in light of their verdict. We hold that the jury could not have resolved factual disputes in the proof to support a determination of self-defense. *See Ivy*, 868 S.W.2d at 728. Accordingly, we conclude that the trial court did not err by finding that the issue of self-defense was not fairly raised.

## CONCLUSION

Based upon the foregoing reasons, we affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE